UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------X
RACHEL ESCHENASY AND DAN
ESCHENASY, PARENTS OF DISABLED
CHILD ANN ESCHENASY,

                 Plaintiffs,          <u>OPINION</u>

     -against-                06 Civ. 15524 (MGC)


NEW YORK CITY DEPARTMENT OF
EDCUATION AND THE CITY OF NEW YORK,

                 Defendants.

--------------------------------X

APPEARANCES:

        LAW OFFICES OF GEORGE ZELMA
        Attorney for Plaintiff
        888 Seventh Avenue
        45th Floor
        New York, New York  10106

        By:  George Zelma, Esq.

        MICHAEL CARDOZO, CORPORATION COUNSEL OF
        THE CITY OF NEW YORK
        Attorneys for Defendant
        100 Church Street
        New York, New York  10007

        By:  Steven D. Weber, Esq.


**Cedarbaum, J.**

    Rachel and Dan Eschenasy, plaintiffs as parents of Ann

Eschenasy, move for summary judgment that Ann should have been

classified as a student with an emotional disturbance as defined

in Individuals with Disabilities Education Act (IDEA) and that they should receive tuition reimbursement for John Dewey Academy and the Elan School.  The New York City Department of Education ("NYC DOE") and the City of New York, defendants, also move for summary judgment on the grounds that the State Review Officer correctly concluded that Ann was not emotionally disturbed and, therefore, properly denied plaintiffs' request for tuition reimbursement.  Defendants also move to dismiss the City of New York for failure to state a claim against it.  For the reasons that follow, plaintiffs' motion for summary judgment that Ann is a student with a disability who, by reason thereof, needs special education is granted.  Plaintiffs' motion for tuition reimbursement is granted for the Elan School and denied for John Dewey Academy.  Accordingly, plaintiffs' motion for summary judgment is granted in part and denied in part.  Defendants' motion for summary judgment is granted in part and denied in part.  The motion to dismiss the City of New York is granted.

**BACKGROUND**

**I. Ann's Educational History**

  Ann Eschenasy was a nineteen-year-old girl attending the Elan School when the motions for summary judgment were filed. Her educational history, based on undisputed factual findings and testimony in the administrative hearings below, began with her enrollment in P.S. 199 for kindergarten.  Ann had no reported problems in kindergarten but her parents moved her to private school the following year because class sizes were too large. From first to eighth grade, Ann attended Park East Day School, where she began exhibiting social and academic problems.  Ann developed a pattern of stealing at the age of eight.  She also dressed inappropriately and engaged in sexual misconduct by touching boys.  In addition, because Ann had difficulty learning to read and struggled to complete her homework, her parents arranged for extra tutoring.

  Ann began high school at the Heschel Day School.  During her time at Heschel, Ann exhibited serious behavioral problems.  She stole, broke school rules, obtained a tattoo and body piercings, made inappropriate friends on the internet, began using drugs, and ran away from home.  Furthermore, she failed a number of her classes.

  Also while she was at Heschel, Ann began cutting herself and purging.  Ann's pediatrician started her on Effexor, a mood

3

stabilizing drug.  Her pediatrician then referred her to Dr.
Markus Kraebber, a child and adolescent psychiatrist.  Dr.
Kraebber diagnosed Ann with a mood disorder and cluster B
(histrionic, borderline and antisocial) traits.  He recommended
that Ann continue to take the mood stabilizing drug and that she
be placed in a structured educational environment to address her
needs for positive feedback, containment and consistent limits.

Ann was asked to leave Heschel after the 10th grade because
of stealing.  After her expulsion, Ann was caught forging $3,000
worth of checks.  Shortly thereafter, she overdosed on Effexor
and was hospitalized. Following hospitalization, Ann began
dialectical behavioral therapy (DBT) with Susan Cappi.  Ann's
participation in DBT was described as poor.  Ann came to multiple
DBT group sessions high on marijuana and discussed securing
cocaine for another group member.

Ann's next school was the Beekman School, where she spent
the first semester of her eleventh grade year.  At Beekman, Ann
used drugs heavily and repeatedly cut classes.  She was suspended
several times for refusal to attend class and was finally
expelled in December of 2004 because of absenteeism.  Ann also
ran away from home for the first time in December of 2004.

For the spring semester of her eleventh grade year, Ann was
sent to the Smith School.  At Smith, Ann continued to use drugs
and misbehave.  After two months, Ann was suspended for theft and

4

use of a classmate's credit card.  Ann finished the semester at
home with a tutor and was asked not to return to Smith.

Ann ran away from home for the second time in March of 2005.
Around this time, Ann's DBT therapist, Susan Cappi, recommended
that Ann be placed in a therapeutic boarding school.  In order to
facilitate boarding school admissions, plaintiffs obtained a
neuropsychological evaluation to assess Ann's intellectual,
cognitive and emotional function.  In May and June of 2005, a
private evaluation was conducted by a neuropsychologist, Dr.
Barron, who reported that Ann's intellectual ability was in the
average range and her academic achievement was on or above the
expected level.  Dr. Barron also noted that Ann experienced
considerable personal stress stemming from lack of self esteem
and the conflict engendered by her persistent need for nurturing
and affection and her impulsive, willful and obstinate behavior.
She found that Ann has a mild, but measurable anomia, a word-
finding problem.  She diagnosed Ann with conduct disorder,
trichotillomania (pulling out hair), borderline personality
features and expressive language disorder with mild amnestic
features.

By letter dated June 23, 2005, Rachel Eschenasy requested an
evaluation of Ann by the NYC DOE's Committee on Special Education
("CSE").  Despite their request for a CSE evaluation, plaintiffs
unilaterally enrolled Ann at the John Dewey Academy ("Dewey"), a

therapeutic boarding school in Great Barrington, Massachusetts, on August 17, 2005, before the CSE had convened. Ann attended Dewey for several months but was confronted by the headmaster and students about lying and breaking school rules in December of 2005. Ann then entered a wilderness crisis intervention program, anticipating that she would be allowed to return to Dewey once she completed the program. Ann was allowed to return, but was asked to leave Dewey shortly thereafter because the staff believed that Ann required a more restrictive and structured program.

Plaintiffs then enrolled her in the Elan School, another boarding school recommended by the Dewey staff as a more appropriate placement for Ann. Ann was attending the Elan School when summary judgment motions were filed.

## II. Plaintiffs' Request for a CSE

Ann's case before the DOE proceeded simultaneously with her enrollment at Dewey and Elan. Plaintiff Rachel Eschenasy first requested an evaluation by the NYC DOE's CSE on June 23, 2005. On July 18, 2005, she advised the CSE chairman that Ann was scheduled to go on vacation on July 28, 2005, but would be available for an evaluation prior to that date. Then, on August 17, 2005, without first notifying the CSE, plaintiffs unilaterally enrolled Ann at Dewey.

Rachel Eschenasy advised the CSE that Ann had been enrolled in Dewey on August 26, 2005.  On September 23, 2005, she provided the CSE with consent to evaluate Ann.  On this same day, a social history was conducted and plaintiffs provided the social worker with a copy of the May/June 2005 neuropsychological evaluation completed by Dr. Barron.

Between September and December of 2005, a series of letters were exchanged between plaintiffs and the DOE.  The DOE initially requested that Ann be made available for an evaluation. Plaintiffs responded that she was too fragile to travel back to New York from Dewey in Massachusetts, but indicated that they would provide the CSE with reports from Ann's psychiatrist and teachers.  Subsequently, the DOE sent several follow up letters requesting these reports.

On December 6, 2005, Rachel Eschenasy sent a letter to the DOE through her attorney requesting that an impartial hearing be held and that the impartial hearing officer order the CSE to convene and develop an individualized education program for Ann. The letter stated that because no CSE meeting had been scheduled for Ann, plaintiffs had no choice but to keep Ann at Dewey. The letter also requested reimbursement for costs and fees.

On December 12, 2005, the regional CSE chairperson sent a letter to plaintiffs, stating that because the parents had failed to arrange for Ann to be evaluated and had failed to provide the

requested documentation, Ann's case was being closed.  Rachel Eschenasy responded on December 27, 2005, stating that she had sent the reports to the district three times, but was enclosing them again.  On January 31, 2006, the CSE was convened for an initial review.

### III.  The Administrative Determinations Below

Rachel Eschenasy, a district representative, a general education teacher, a school psychologist, a special education teacher, a social worker, a parent member, an educational advocate and the founder of Dewey attended the CSE meeting.  At the meeting, plaintiffs informed the CSE that Ann had transferred to Elan the day before.  The DOE was unaware of the transfer and therefore no one from Elan participated.  The CSE determined that Ann was not emotionally disturbed and therefore not disabled under the IDEA.

Plaintiffs filed a complaint with the DOE appealing this determination.  An impartial hearing was commenced on May 11, 2006, and concluded on May 19, 2006, after four days of testimony.  The impartial hearing officer ("IHO") found that Ann is "socially maladjusted" and also "seriously emotionally disturbed."  According to the IHO, Ann's lying, stealing, truancy and drug abuse are symptomatic of social maladjustment.  Ann's cutting and hair pulling are symptomatic of emotional disturbance.  The IHO concluded that Elan, but not Dewey, was reasonably calculated to provide Ann an educational benefit and ordered that plaintiffs be reimbursed for Elan's tuition.  Dewey was not reasonably calculated to provide Ann with educational benefit because the program was too loosely structured, provided too little supervision and placed high expectations on the

9

students.  By contrast, Elan was appropriate because it was non-voluntary and designed to stress a work ethic.  Ann's high grades at Elan confirmed that she was deriving educational benefit from the program there.

On appeal, in a decision dated August 31, 2006, the State Review Officer ("SRO") reversed the IHO's opinion, holding that Ann was not properly classified as emotionally disturbed and therefore plaintiffs were not entitled to any tuition reimbursement.  Although the SRO acknowledged that Ann exhibited inappropriate behaviors such as cutting and hair pulling, the SRO concluded that plaintiffs had "not shown that these behaviors affect [Ann's] educational performance to the extent that she needed special education."

Plaintiffs filed this federal suit to challenge the decision of the SRO.

**DISCUSSION**

**I. The Statutory Scheme of the IDEA**

      **A)    Standard of Review**

Section 1415(i)(2)(C) of the IDEA provides that "the [district] court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C).  The level of deference due to the administrative determinations of the state educational agency depends on what type of determination a district court is reviewing.

The most common question to arise is whether a proposed individual education plan is appropriate.  The role of the reviewing court in making this assessment is "circumscribed." M.C. ex rel Mrs. C. v. Voluntown Bd. Of Educ., 226 F.3d 60, 66 (2d Cir. 2000).  "The district courts are required to give 'due weight' to the findings of a state administrative proceeding, and the 'preponderance' review provision set forth in the IDEA 'is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review.'" Muller ex rel Muller v. Committee on Special Educ., 145 F.3d 95, 101 (2d Cir. 1998)

(quoting <u>Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley</u>, 458 U.S. 176, 206 (1982)).

However, the Second Circuit has held that deference to the state educational agency is not required when reviewing a determination that a student is an individual with or without a disability. <u>Muller</u>, 145 F.3d at 102. The central issue in <u>Muller</u>, as is true in this case, was whether the student qualified as "emotionally disturbed" as defined in the relevant state and federal regulations, such that she qualified as disabled. The Second Circuit stated that "resolution of this issue involves interpretation of the IDEA and the definition of 'emotional disturbance' under the applicable federal and New York State regulations. In this matter of statutory interpretation,. . . state administrative officials [a]re in no better position than the district court to make conclusions with respect to [the student]'s statutory eligibility based on the record." <u>Id</u>. The Court further explained that "application of the IDEA's statutory and regulatory definitions to the particular facts of [a student]'s medical and educational history" is a "mixed question of law and fact." <u>Id</u>. at 102. Thus although "<u>Rowley</u> requires that federal courts defer to the final decisions of state authorities," where the question is one of statutory eligibility, the district court is "free to consider the issue of [the student]'s statutory eligibility de novo." <u>Id</u>. at 101-02.

### B)     The Standard for Determining Whether Ann Has A Serious Emotional Disturbance

The IDEA defines a "child with a disability" as "a child with mental retardation, hearing impairments, … serious emotional disturbance (referred to in this title as 'emotional disturbance') …or specific learning disabilities; and who, by reason thereof, needs special education and related services." 20 U.S.C. § 1401(3)(A).  Both New York State and federal regulations define an emotional disturbance in the same way, as:

> i)   a condition exhibiting one or more of the following characteristics over a long period of time and to a marked degree that adversely affects a child's educational performance:
>   (A)  An inability to learn that cannot be explained by intellectual, sensory, or health factors.
>   (B)  An inability to build or maintain satisfactory interpersonal relationships with peers and teachers.
>   (C)  Inappropriate types of behavior or feelings under normal circumstances.
>   (D)  A general pervasive mood of unhappiness or depression.
>   (E)  A tendency to develop physical symptoms or fears associated with personal or school problems.
> ii)  Emotional disturbance includes schizophrenia. The term does not apply to children who are socially maladjusted, unless it is determined that they have an emotional disturbance under paragraph (c)(4)(i) of this section.
> 34 CFR § 300.8(c)(4)(i)-(ii); 8 NYCRR § 200.1(zz)(4).

The regulatory definition delineates four specific conditions a student must satisfy in order to qualify as seriously emotionally disturbed: the student must demonstrate that she has (1) exhibited one of the five listed symptoms, (2) "over a long period of time," and (3) "to a marked degree," and (4) that this condition adversely affects her educational performance. Finally, the definition excludes students whose

behavior is attributable to social maladjustment, unless they also suffer from emotional disturbance.

### III. Whether Ann Has A Serious Emotional Disturbance

#### A) Ann's Symptoms

I find that Ann has exhibited two of the five symptoms of emotional disturbance over a long period of time and to a marked degree.

### 1) Ann Exhibits Inappropriate types of behavior or feelings under normal circumstances.

Ann's trichotillomania, self-cutting and suicide attempt are inappropriate behavior under otherwise normal circumstances. According to Ann's father, the hair pulling and cutting behavior was still continuing during her time at Elan when this suit was filed.

Defendants argue that Ann's behavior is simply delinquent and is attributable to Ann's diagnosed conduct disorder rather than an emotional disturbance.  In their briefing, Defendants compare Ann to the case of Edward Springer, whom the Fourth Circuit found was not disabled.  Springer v. Fairfax County Sch. Bd., 134 F.3d 659 (4th Cir. 1998).  In Springer, the Fourth Circuit reasoned that any adverse effects on the student's educational performance were the result of his truancy and drug use, not an emotional disturbance.  Id. at 664.  The Court credited the testimony of a psychiatrist who found that the student was in control of his actions, unlike emotionally disturbed individuals who may be "in such pain and in such difficulty that they cannot get to their goals."  Id. at 665. Distinguishing Springer, the IHO in this case found "Ann's behavior, her cutting and hair pulling, in particular, reveals a girl in such pain and such difficulty that she cannot get to her goals."  IHO findings at 15.  The IHO determined that Ann's case was also distinguishable from Springer because her behavior has continued for a long time and to a marked degree, noting that Ann has been lying and stealing since she was eight years old, when no drugs were involved, and is now cutting herself and pulling out her hair.

Whether or not such behavior "adversely affected" Ann's "educational performance" (a question addressed below), the IHO was correct in finding that Ann exhibits inappropriate types of behavior or feelings under normal circumstances.

### 2) Ann Has A Generally Pervasive Mood of Unhappiness or Depression

There is not a significant amount of evidence in the record about Ann's mood.  However, Ann has been diagnosed with a mood

disorder, and prescribed drugs to treat it.  Ann also attempted suicide in June 2004.  In <u>Muller</u>, the Second Circuit found that Treena Muller exhibited a pervasive mood of depression.  Although Muller was "never formally diagnosed with clinical depression, the regulation does not require that the student be clinically or medically depressed."  <u>Muller</u>, 145 F.3d at 104.  Because Treena displayed signs "not only of unhappiness and depression, but of despondency, as evidenced by her suicide attempt," the court held that she exhibited a pervasive mood of unhappiness as enumerated in the definition of emotional disturbance. <u>Id</u>.  Comparing Ann's case with that of <u>Muller</u>, Ann has also exhibited a general pervasive mood of unhappiness over a long period of time and to a marked degree, as evidenced by her hair pulling, cutting, mood disorder and her suicide attempt.

**B)    Impact on Ann's "Educational Performance"**

To qualify as an emotional disturbance, Ann's symptoms must adversely affect her "educational performance."  34 CFR § 300.8(c)(4); 8 NYCRR § 200.1(zz)(4).  The SRO concluded that Ann's emotional problems did not adversely impact her educational performance.  Despite acknowledging testimony in the record that Ann failed several courses in high school, the SRO stated that there was no documentary evidence of failing grades nor was there any testimony from her teachers or any indication that she had been held back a grade.  Based on this lack of evidence, the SRO found that Ann had not shown that her emotional problems adversely affected her educational performance.

In order to address the SRO's contention that there was insufficient evidence of Ann's academic problems, plaintiffs have proffered additional evidence to this court, in the form of her high school transcripts and an affidavit, that was not proffered in the administrative hearings below.  The transcripts show that Ann failed many courses at Beekman and Smith, the first two high schools she attended.  The affidavit is sworn to by plaintiffs and describes the problems Ann experienced in school.  The parties dispute whether this additional evidence is admissible.

**1) Additional Evidence of Effects on Ann's Educational Performance**

The SRO acknowledged that there was testimony in the record stating that Ann failed several classes in ninth and tenth grade.  Therefore, Ann's high school transcripts illustrating her failing grades are duplicative.  Similarly, because plaintiffs testified before the IHO, their affidavit is also largely duplicative of their earlier testimony.

However, the IDEA provides that a court reviewing an administrative decision "shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and basing its decision on the preponderance of the evidence, shall grant such relief as the court determines

is appropriate." 20 U.S.C. § 1415(i)(2)(C).  The Second Circuit
has yet to address the standard for admitting additional evidence
in an IDEA proceeding.  However, the First Circuit's decision in
Town of Burlington v. Dept. of Educ. for Mass. represents the
approach adopted by a majority of those Circuits, including the
Seventh, Ninth, and Eleventh Circuits, deciding the issue. 736
F.2d 773 (1st Cir. 1984) aff'd 471 U.S. 359 (1985). In
Burlington, the First Circuit held that the administrative record
should be the main source of evidence with limited additions, but
rejected a rigid rule that would "unduly limit" the reviewing
court's discretion.  Id. at 790-91.  Rather, the First Circuit
adopted a rebuttable presumption prohibiting additional evidence
that was not presented during the administrative proceedings
below.  Id.  Similarly, the Third Circuit has stated that the
district court should consider additional evidence that is
"relevant, non-cumulative, and useful."  Susan N. v. Wilson Sch.
Dist., 70 F.3d 751, 760 (3d Cir. 1995).

Applying the Burlington standard, Ann's transcripts are
admissible under 20 U.S.C. § 1415(i)(2)(B).  These documents pre-
date the impartial hearing and thus could have been proffered at
that time.  However, the documents are relevant and useful to the
analysis of whether Ann's emotional problems have affected her
educational performance.  This is especially true in light of the
SRO's confusing statements about Ann's failing grades and his
suggestion that there was insufficient documentary evidence that
her school work had been adversely affected.  In addition, this
evidence directly contradicts defendants' argument that Ann has
been able to obtain passing grades despite her emotional
problems.  I therefore conclude that the usefulness of these
transcripts outweighs any procedural considerations weighing
against their admission.  Plaintiffs' supplemental affidavit, on
the other hand, does not add any significant information not
already in the record. Moreover, Ann's parents testified in the
administrative hearing in front of the IHO.  Therefore, the
affidavit is not admitted.

**2) Adverse Effects on Ann's Educational Performance**
The SRO concluded that there was insufficient evidence of an
adverse effect on Ann's educational performance.  The SRO's
finding is directly contradicted by Ann's failing grades,
repeated expulsions, suspensions, need for tutors and need for
summer school.

However, Defendants allege that in order for Ann to qualify
as emotionally disturbed, there must be some further evidence
that these negative effects on Ann's education were caused by her
emotional disturbance symptoms – i.e. her inappropriate behavior
under normal circumstances and her pervasive depressive state –
and not simply by her bad behavior.  The regulation defining

emotional disturbance specifies that social maladjustment by itself is not a disability. 34 CFR § 300.8(c)(4); 8 NYCRR § 200.1(zz)(4).

It is undisputed that Ann repeatedly misbehaved in school by cutting class, taking drugs, and stealing. Indeed, psychologist Susan Cappi and neuropsychologist Dr. Barron both diagnosed Ann with conduct disorder. Plaintiff's Exs. O, P. However, Ann also engages in hair pulling and cutting herself, was diagnosed with a mood disorder, diagnosed with borderline personality features and attempted to commit suicide. Ann's neuropsychologist, Dr. Barron, testified that she had considered the criteria for the educational definition of emotional disturbance and determined that Ann met those criteria.

In Muller, the Second Circuit stated that the testimony of psychologists that a student's emotional difficulties adversely affected her education, together with evidence that her educational performance improved in settings where her emotional problems were being addressed clinically, adequately supported the conclusion that she was emotionally disturbed. Muller, 145 F.3d at 103-04. Similarly, in this case, Dr. Barron testified before the IHO that Ann meets the criteria for emotional disturbance. Ann has also shown significant progress at Elan, where she is receiving the type of structured educational program her doctors recommended. The students at Elan participate in a daytime work program which emphasizes work ethic and is designed to motivate students through promotions. In this program, Ann has been promoted from a worker to a service crew member, where her responsibilities include supervision of other children. In addition, Ann has received high grades at Elan, consisting of two A's, one B and one P.

Reviewing Ann's eligibility de novo, it is more likely than not that all of Ann's problems, not just her misconduct, underlie her erratic grades, expulsions and need for tutoring and summer school. Although Ann exhibits conduct disorder, she also meets the criteria for emotional disturbance as a student exhibiting inappropriate behavior under normal circumstances and a pervasive depressive state, which adversely affect her educational performance. She therefore qualifies as a disabled student who, by reason thereof, needs special education.

## IV. Entitlement to Reimbursement Under the IDEA

The IDEA broadly authorizes a district court to "grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C). The Supreme Court has held that this provision includes the power to order school authorities to reimburse parents for their expenditures on private special education for a child if the court determines that such placement, rather than the school district's proposed individual education plan, is

proper.  <u>Sch. Comm. of Burlington, Mass. v. Dep't of Educ.</u>, 471
U.S. 359, 369 (1985).  There are two factors that should be
considered in determining whether a public school district is
required to reimburse the child's parents: (1) whether the school
district's placement pursuant to its individual education plan is
inappropriate, and (2) whether the private placement desired by
the parents is appropriate.  <u>Id.</u> at 370.  Because the District
did not formulate an individual education plan for Ann, its
placement was not appropriate.

    **A)    Test for Determining Whether Private Placement Is
Appropriate**

    Subject to minor exceptions, the same considerations that
apply in determining whether the School District's placement is
appropriate should be considered in determining the
appropriateness of the parents' placement. <u>Frank G. v. Bd. of
Educ. of Hyde Park</u>, 459 F.3d 356, 365 (2d Cir. N.Y. 2006).
Ultimately, the issue turns on whether a placement - public or
private - is "reasonably calculated to enable [the child] to
receive educational benefits." <u>Id.</u> at 366. (citations omitted).
A placement meeting this standard is one that is "likely to
produce progress, not regression." <u>Walczak v. Fla. Union Free
Sch. Dist.</u>, 142 F.3d 119, 130 (2d Cir. 1998) (internal quotation
marks omitted).  Courts must "examine the record for any
'objective evidence' indicating whether the child [wa]s likely to
make progress or regress under the proposed plan." <u>Id.</u> (quoting
<u>Mrs. B. v. Milford Bd. of Educ.</u>, 103 F.3d 1114, 1121 (2d Cir.
1997)). Thus, "in the regular classrooms of a public school
system, the achievement of passing marks and regular advancement
from grade to grade will be one important factor in determining
educational benefit." <u>Rowley</u>, 458 U.S. at 207 n.28. "Although it
is more difficult to assess the significance of grades and
regular advancement outside the context of regular public
classrooms, these factors can still be helpful in determining the
appropriateness of an alternative educational placement." <u>Frank
G</u>, 459 F.3d at 364.

    The Second Circuit further elaborates:

    No one factor is necessarily dispositive in determining
whether parents' unilateral placement is reasonably
calculated to enable the child to receive educational
benefits. Grades, test scores, and regular advancement may
constitute evidence that a child is receiving educational
benefit, but courts assessing the propriety of a unilateral
placement consider the totality of the circumstances in
determining whether that placement reasonably serves a
child's individual needs. To qualify for reimbursement under

the IDEA, parents need not show that a private placement
furnishes every special service necessary to maximize their
child's potential. They need only demonstrate that the
placement provides educational instruction *specially
designed to meet the unique needs of a handicapped child*,
supported by such services as are necessary to permit the
child to benefit from instruction.

Frank G., 459 F.3d at 364-65 (internal quotation marks
omitted) (emphasis added).

Finally, the IDEA requires participating States to educate
handicapped children with non-handicapped children whenever
possible.  20 U.S.C. § 1412(a)(5).  Based on this provision,
courts have found that there is a presumption in favor of
mainstreaming.  Muller, 145 F.3d at 105.  The Second Circuit has
stated that parents "may not be subject to the same mainstreaming
requirements as a school board." M.S. ex rel S.S. v. Bd. of Educ.
of Yonkers, 231 F.3d 96, 105 (2d Cir. 2000).  "Nonetheless, the
requirement that an appropriate education be in the mainstream to
the extent possible, see 20 U.S.C. § 1412(5)(B)(1994), remains a
consideration in determining whether a private placement was
appropriate."  Id. at 105.

**B) Dewey Was Not An Appropriate Placement for Ann**

Plaintiffs argue that at the time of enrollment, Dewey was reasonably calculated to meet Ann's specific educational needs. They assert that they placed her in the least restrictive environment in August 2005, following the IDEA preference for mainstreaming.  Dr. Barron's report recommended "a college preparatory boarding school with a strong therapeutic component." In keeping with this recommendation, there is a significant therapeutic component to the program at Dewey, including group therapy, individual counseling and support groups.

However, the objective evidence of Ann's performance at

Dewey indicates that Dewey was not an appropriate placement for

her.  Because Ann was at Dewey for only one semester, her grades

from Dewey consist of a single progress note.  As of November

2005, she had earned a B in Novel, D in U.S. History, D in Pre-

Calculus, C in Chemistry, B in Spanish and an A in Studio Art.

Given Ann's similarly disparate grades at her prior high schools,

these grades do not indicate that placement at Dewey met Ann's

particular needs.  Moreover, Ann was asked to leave Dewey after

her first semester there because of her poor behavior.  Ann would

not cooperate with the staff, was caught breaking school rules

and attempted to run away.

Furthermore, Ann's doctors recommended a more restrictive and structured program than Dewey provided.  Her neuropsychologist, Dr. Barron, advised that she be placed in an atmosphere with "intensive, individualized instruction and therapy with uncompromising expectations."  The letter submitted by her child psychiatrist, Dr. Kraebber, also recommended that she be placed in a "structured environment to address the needs for positive feedback, containment and consistent limits." Dewey, however, was not a sufficiently restrictive or structured environment.  Dr. Bratter, the Dean of Students at Dewey, testified that Dewey is "loosely structured" and gives students "a lot of freedom."  Likewise, Dewey's founder stated that Dewey is a voluntary school and that "if the adolescents want to leave,

21

we in no way try to restrain that youngster or in fact convince
the youngster to stay."

    Based on the totality of the evidence, Dewey was not an
appropriate placement for Ann.

### C) Elan Is An Appropriate Placement

    Upon asking Ann to leave, the Dewey staff specifically
recommended Elan as a more appropriate placement for her.  Elan
is a highly structured, non-voluntary program.  The students at
Elan participate in a daytime work program which emphasizes work
ethic and is designed to motivate students through promotions.
In this program, Ann has been promoted from a worker to a service
crew member, where her responsibilities include supervision of
other children.  In addition, Ann has achieved high grades at
Elan, receiving two A's, one B and one P.

    Given the strength of the objective evidence of Ann's
progress at Elan, as well as the fact that the program at Elan
fits the specific recommendations of Ann's doctors, Elan is an
appropriate placement for her.

## V. Alleged Procedural Violations

    Plaintiffs allege in their Amended Complaint that the DOE
violated the procedural provisions of IDEA by (1) failing to
conduct an evaluation of Ann within 60 days of receiving parental
consent, (2) failing to conduct a classroom observation and (3)
failing to consider three mental health reports submitted by
plaintiffs.

    The IDEA mandates an evaluation "to determine whether a
child is a child with a disability within 60 days of receiving
parental consent for the evaluation."  20 U.S.C. §
1414(a)(1)(C)(i)(I).  In addition, the CSE must conduct a
classroom observation as part of this initial evaluation.  8
NYCRR § 200.4(b)(iv).  However, the 60-day time frame for
evaluation does not apply if "the parent of a child repeatedly
fails or refuses to produce the child for the evaluation."  20
U.S.C. § 1414(a)(1)(C)(ii)(II).  Both the SRO and the IHO found
that the District did not complete an evaluation of Ann prior to
the commencement of the 2005-2006 school year because of the
timing of plaintiffs' initial request, Ann's family vacation in
July and her mid-August enrollment at Dewey.  Rachel Eschenasy
first requested an evaluation by the CSE on June 23, 2005.
However, on July 18, 2005, she advised the CSE chairman that Ann
was scheduled to leave the country for vacation on July 28, 2005.
Then, on August 17, 2005, plaintiffs unilaterally enrolled Ann at
John Dewey Academy ("Dewey").

    Furthermore, plaintiffs did not consent to the initial
evaluation of Ann until September 23, 2005, after Ann had already
left for Dewey.  The NYC DOE attempted to arrange an evaluation
by letter of September 28, but plaintiffs refused to bring Ann

back from the Dewey school in Massachusetts for an evaluation. Given these circumstances, the DOE was not at fault for failing to conduct an evaluation and classroom observation within 60 days of receiving parental consent.

Finally, several of the CSE participants who testified before the IHO, including Susan Keohane, a social worker, and Cecilia Perez, a psychologist, testified specifically with regard to the reports submitted by plaintiffs.  Thus the CSE considered the reports submitted by plaintiffs and did not violate the procedural requirements of IDEA.

## VI.  Equitable Considerations

In any action brought under the IDEA, the presiding court "shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C)(iii).  Under this provision, "equitable considerations are relevant in fashioning relief," and the court enjoys "broad discretion" in so doing.  Burlington, 471 U.S. at 369, 372.  "Courts fashioning discretionary equitable relief under IDEA must consider all relevant factors, including the appropriate and reasonable level of reimbursement that should be required. Total reimbursement will not be appropriate if the court determines that the cost of the private education was unreasonable."  Florence County Sch. Dist. Four v. Carter, 510 U.S. 7, 16 (1993).  The IDEA provides that an award of tuition reimbursement may be reduced or denied "upon a judicial finding of unreasonableness with respect to action taken by the parents." 20 U.S.C. § 1412(a)(10)(C)(iii)(III).

There has been no showing that the amount paid for Elan tuition is unreasonable.  Moreover, although plaintiffs unilaterally enrolled Ann in private schools, there has been no showing that they acted unreasonably under the circumstances. Therefore, the DOE is directed to reimburse plaintiffs, upon proper proof of payment, for her tuition at the Elan school.

**VII. Plaintiffs' Claim for Attorneys Fees**

Plaintiffs have requested reimbursement of their attorneys' fees.  The IDEA states that the District Court may, in its discretion, award attorneys fees as part of the costs to the prevailing party.  20 U.S.C. § 1415(i)(3)(B)(i).  By taking Ann on vacation shortly after requesting a CSE and then sending her to Dewey in mid-August without first notifying the DOE, plaintiffs were at least partially to blame for the inability of the DOE to conduct an evaluation and classroom observation of Ann prior to her enrollment at Dewey.  Plaintiffs also failed to notify the DOE of Ann's enrollment at Elan prior to the CSE. Because the equities do not favor plaintiffs, their claim for attorneys' fees is denied.

**VIII.    Motion by Defendants to Dismiss the City of New York**

Defendants also move to dismiss the City of New York for failure to state a claim against it.  It is well settled that "[t]he Board of Education of the City of New York is not a department of the city government, it is an independent corporate body and may sue and be sued in its corporate name."  Divisich v. Marshall, 281 N.Y. 170, 173 (N.Y. 1939).  Because the City and DOE are separate and distinct entities, "[i]n the absence of any allegations demonstrating participation by the City, the complaint fails to state a cause of action against it." Falchenberg v. New York City Dep't of Educ., 375 F. Supp. 2d 344, 347 (S.D.N.Y. 2005).

Because plaintiffs in this case have made no allegations against the City of New York or any of its employees, the motion to dismiss the City of New York is granted.

CONCLUSION

For the foregoing reasons, plaintiffs' motion for summary judgment that Ann should have been classified as a student with an emotional disturbance is granted.  Plaintiffs' motion for tuition reimbursement for the John Dewey Academy is denied and their motion for tuition reimbursement for the Elan School is granted.  Accordingly, plaintiffs' motion for summary judgment is granted in part and denied in part.  Defendants' motion for

summary judgment is granted in part and denied in part.  Upon

proper proof of payment, the Department of Education is ordered

to reimburse plaintiffs for tuition for the Elan School.

Defendants' motion to dismiss the City of New York is granted.


SO ORDERED.

Date:    New York, New York
         March 25, 2009


                            S/_____
                                MIRIAM GOLDMAN CEDARBAUM
                                United States District Judge